**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**
(Orlando Division)

| | |
|---|---|
| **UNIVERSAL MORTGAGE & FINANCE, INC.**<br>3157 Braverton Street<br>Edgewater, Maryland 21037<br><br>Plaintiff.<br><br>vs.<br><br>**NATIONWIDE MORTGAGE BANKERS, INC.**<br>310 A. Main Street<br>Lebanon, New Jersey 08833<br><br>Serve On:<br>    Corporation Service Company<br>    1201 Hays Street<br>    Tallahassee, Florida 32301-2525<br><br>Defendant. | Case No.  6:21-cv-2134 |

## COMPLAINT

Universal Mortgage & Finance, Inc., Plaintiff, by and through its undersigned attorney, Thomas J. Fraser, Jr., and the law firm of Eavenson, Fraser & Lunsford, PLLC, brings this action against Nationwide Mortgage Bankers, Inc., Defendant, and for good cause states:

### Parties, Jurisdiction, & Venue

1. Universal Mortgage & Finance, Inc., Plaintiff, is a business with its principal office located in Anne Arundel County, Maryland (hereinafter referred to as "Universal"). Universal conducts business throughout the United States.

2. Defendant, Nationwide Mortgage Bankers, Inc. (NMLS #819382) is foreign corporation with its principal office located in Lebanon, New Jersey ("NMB"). NMB conducts business throughout the United States and has had approximately seventeen (17) branch locations in

…

Florida, including four (4) branches in Orange County, Florida. NMB is a "Mortgage Lender" pursuant to §494.001(24), Florida Statutes.

3. Both Universal and NMB offer residential mortgage loans to the general public.

4. Mortgage lenders and loan originators, like Universal and NMB, must adhere to very strict mortgage lending laws can be found, among other laws and regulations, in the federal Secure and Fair Enforcement for Mortgage Licensing Act of 2008, the Florida S.A.F.E. Act, and the HUD Single Family Housing Policy Handbook 4000.1.

5. The very strict legal requirements applicable to mortgage lenders, like Universal and NMB, are implemented, interpreted, and/or enforced, by the United States Department of Housing and Urban Development ("HUD"), the Federal Housing Finance Agency ("FHFA"), the Florida Office of Financial Regulation ("FOFR"), and the Consumer Financial Protection Bureau ("CFPB"), among others.

6. NMB employs at least two or more employees who are engaged in commerce, produce goods for commerce, or handle, sell, or otherwise work on goods or materials that have moved in or were produced for commerce as a single enterprise.

7. Most of acts and transactions that form the basis of this Complaint occurred in Orange County, Florida, and/or related to real property in an about Orange County, Florida.

8. This Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because the suit involves parties of different states, State of Maryland and State of New Jersey, both registered to conduct business in the State of Florida, and the amount in controversy exceeds $75,000.00, excluding interest and costs.

9. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because Universal's state law based claims are so related to the claims within this Court's original

jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

10. Venue and personal jurisdiction are proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial number of the real properties and/or a substantial part of the events giving rise to these claims occurred in Orange County, Florida.

## Factual Background

11. Universal is a mortgage lender which formerly had several branch offices in and about the Orlando, Florida metropolitan area.

12. Since its inception, Universal has developed, implemented, and monitored strict internal policies and controls intended to prevent employees from violating applicable laws and to protect the public. Universal justifiably relied upon its employees, especially its licensed managers, to play their respective role(s) in the implementation of its internal and public protection policies.

13. In and throughout 2017, Universal employed several high-level executives in whom it rightfully reposed trust and confidence of particular interest to this Complaint.

14. For most of 2017, Chris Schiele served as Universal's Chief Operating Officer ("Schiele").

15. In and through 2017, Jorge Diaz (NMLS #339949) served as Universal's Division Manager of Universal's former Orlando, Florida Division ("Diaz").

16. The terms of Diaz employment with Universal were memorialized in a fully executed Division Management Agreement.

17. Each of Schiele and Diaz represented to Universal that he complied with all of Universal's policies and procedures, including but not limited to protecting against the release or conversion of Universal's borrower information, and intellectual property.

18. Universal's former Orlando, Florida Division included five (5) locations in the Orlando, Florida area, specifically including 8810 Commodity, Circle, Suite 4A, Orlando, Florida and 12401 Orange Drive, Suite 220, Davie, Florida ("Universal's Former Orlando Operations").

19. Then unbeknownst to Universal; Schiele, Diaz, and NMB were concocting a scheme to orchestrate the *en masse* resignation of Universal's Former Orlando Operations (the "Orlando Raid").

20. Incredibly, the Orlando Raid was so blatant, in 2018, several offices simply changed the name on the door from Universal to NMB.

21. Subsequent to the Orlando Raid, Universal discovered that most of Universal's Former Orlando Operations personnel had assumed substantially similar positions with NMB.

22. Subsequent to the Orlando Raid, Universal discovered that NMB converted Universal's assets, trade secrets, borrowers, prospective borrowers, and other intellectual property for its benefit.

23. More specifically, Universal was able to subsequently discover that with the full knowledge and encouragement of NMB, the Orlando Raid included such acts as:

    a) forwarding leads derived from Universal's advertising to NMB;

    b) uploading/downloading electronic files containing Universal's active borrower files/information to NMB;

    c) photocopying paper files containing Universal's active borrower files/information for use by NMB;

    d) uploading/downloading electronic files containing Universal's lending policies and procedures;

    e) forwarding electronic files containing Universal's active borrower

4

        files/information to private emails for prospective borrowers;

    f)    falsifying grounds to deny Universal's active/potential borrower files which NMB completed for its financial gain; and/or

    g)    converting other property or assets in ways yet to be determined.

24. Public records have revealed that the Orlando Raid resulted in nearly completed Universal loans, being diverted to NMB under false pretenses, and closed through NMB.

25. Universal has discovered seventeen (17) loans that originated at Universal's Former Orlando Operations and were at or near their final stages of being funded were instead, fraudulently denied and/or closed out, usually upon the request of Diaz, and closed by NMB (the "Converted Loans").

26. The Converted Loans include:

| Borrower Reference | Property Location | Loan Amount |
|---|---|---|
| Serrano | Orlando, Florida | $230,743.00 |
| Salazar | Apopka, Florida | $274,684.00 |
| Santiago-Quinones | Orlando, Florida | $287,145.00 |
| Vargas | Kissimmee, Florida | $200,778.00 |
| Racanelli | Windermere, Florida | $299,145.00 |
| Egea | Homestead, Florida | $250,000.00 |
| Pertuz | Doral, Florida | $199,200.00 |
| Ordonez | Aventura, Florida | $96,750.00 |
| Myrie | Orlando, Florida | $306,836.00 |
| Pena | Orlando, Florida | $205,214.00 |
| Medina | Miami, Florida | $409,521.00 |
| Lyons | Orlando, Florida | $73,641.00 |
| Romero | Orlando, Florida | $81,000.00 |

| Cordero | Orlando, Florida | $298,953.00 |
|---|---|---|
| Ramos | Orlando, Florida | $155,677.00 |
| Barnet | Miami, Florida | $293,584.00 |
| | Total Loan Volume: | $3,000,662,871.00 |

27. Universal has good faith reason to believe NMB converted other and additional loans yet to be discovered.

28. In some cases, such as the Serrano, Racanelli, & Medina loans, NMB sought to circumvent the FHA transfer process by securing new FHA cases numbers for borrowers and properties already issued an FHA case number. On those loans, there is the added element that the false grounds for termination extended beyond Universal.

29. In other cases, such as the Pertuz and Medina loans, fully processed Universal files were closed through NMB before former Universal employees had even resigned their positions within Universal's Former Orlando Operations. In these cases, Diaz falsely reflected the properties at issue failed a home inspection and/or asserted other false grounds.

30. Upon information and belief, the false grounds noted for denying a loan and/or closing a borrower file were intentional acts of deception such as to prevent Universal's discovery of loans being diverted to NMB.

31. Universal has good faith reason to believe that several of the borrowers whose files were marked as "closed" in Universal's systems, were not actually informed that their loan files were transferred to NMB.

32. Universal has not reviewed a request from any of the borrowers as part of the Converted Loans requesting the transfer of his/her loan to NMB – or cancelling/withdrawing his/her loan from Universal.

## *Count I – Trade Secret Misappropriation*

33. Universal restates Paragraphs 1 through 32 as if fully stated herein.

34. Universal owned, possessed, and developed proprietary information that was used, or intended for use in business that was included in its data compilations, methods, techniques, and processes ("Universal's Secret Information").

35. Universal's Secret Information satisfies the legal definition of a "Trade Secret" under § 688.002(4) of the Florida Statutes.

36. Universal's Secret Information included, but was not limited to:

    a) Internally developed reporting and processes,

    b) Internally developed pricing models,

    c) Internally developed rate calculators,

    d) Internally developed compliance systems, policies, or procedures,

    e) Internally developed lender instructions,

    f) Internally developed underwriting procedures and checklists,

    g) Internally developed service provider lists and approval procedures, and

    h) Compilations of prospective borrower information including, but not limited to: names, properties, rates, birthdates, social security numbers, asset documentation, income documentation, and credit documentation.

37. Universal's Secret Information was not publicly known and was not generally known in the mortgage industry and was rather the culmination of years of local and historical business development/experience and alterations to standard industry operating procedures.

38. Universal's Secret Information is not of the type that could be readily ascertained or derived from publicly available information as such includes information not generally known or

reported to the public and would include personally identifiable information of its past actual and prospective borrowers.

39. Universal's Secret Information was the subject of reasonable efforts to maintain secrecy and included use of copyright symbols, internal systems, limited access office/file location, passwords, information system encryption, and restricted access to cloud/server-based data compilation storage or loan processing platforms.

40. Universal's Secret Information has significant economic value and some forms of Universal's Secret Information, specifically including the compilations of borrower information and borrower specific pricing, had their own independent market value which was significant to Universal.

41. NMB participated in, and/or benefited from, the misappropriations of Universal's Secret Information without Universal's approval, permission, or consent.

42. As noted herein and throughout, Diaz's access to, and disclosure of, Universal's Secret Information constitutes a breach of the confidence Universal reposed in Diaz and presumably occurred during a time in which Universal unwittingly reposed trust and confidence in Diaz prior to the Orlando Raid.

43. NMB knew or should have known that Universal's Secret Information was a "Trade Secret" as defined under § 688.002(4) of the Florida Statutes that should not have closed the Converted Loans.

44. Considering that the applicable laws would require NMB to protect against information analogous to Universal's Secret Information, NMB knew or should have known to refuse and/or reject the Converted Loans and/or the disclosure of Universal's Secret Information.

45. Universal has been damaged by NMB's theft, disclosure, misappropriation, and use of

Universal's Secret Information.

WHEREFORE, the above premises considered, Universal demands judgment for compensatory damages against NMB in excess of $75,000.00 with interest, punitive damages, attorney fees and costs of this action, and such further and different relief as this Court deems just and proper.

### *Count II – Conversion*

46. Universal restates Paragraphs 1 through 32 as if fully stated herein.

47. NMB intentionally took and converted assets and property, including but not limited to active borrower files (aka the Converted Loans), as previously pled herein.

48. NMB intentionally took and converted assets and property in contemplation of closing said loans and thus rendering the Converted Loans to be of no remaining value to Universal.

49. As a direct and proximate cause of NMB's acts of conversion, Universal has suffered substantial economic damages.

WHEREFORE, Universal demands judgment for compensatory damages against NMB in excess of $75,000.00 with interest, punitive damages, attorney fees and costs of this action, and such further and different relief as this Court deems just and proper.

### *Count III – Fraud - Conspiracy*

50. Universal restates Paragraphs 1 through 32 as if fully stated herein.

51. Upon information and belief, at some point NMB permitted and/or perpetrated a scheme to convert or divert Universal's assets as noted herein, proprietary information, and borrowers.

52. In furtherance of this scheme, Diaz made misrepresentations of material facts and/or omitted facts to convert or divert Universal's assets as noted herein, proprietary information, and borrowers.

53. At times, Diaz made misrepresentations of material facts to borrowers and/or supervisors as to the source of certain borrowers and/or the true status of certain loan files in Universal's loan pipeline.

54. The acts of Schiele and/or Diaz were done in contemplation of increasing NMB's revenue from the loan volume being unlawfully transferred from Universal to NMB.

55. The acts of Schiele and/or Diaz encouraged and/or permitted with NMB's actual or constructive knowledge of the falsity of such acts.

56. The acts of Schiele and/or Diaz were done with the intention of carrying out the scheme to convert or divert Universal's assets as noted herein, proprietary information, and borrowers to NMB.

57. The manner in which Schiele and/or Diaz carried out the scheme of affecting a raid of Universal's assets as noted herein, proprietary information, and borrowers was intentionally calculated to prevent detection by Universal.

58. Despite such knowledge, NMB did not refuse, and in fact knowingly accepted the benefits of, the misappropriation of Universal's Secret Information and/or the Converted Loans.

59. NMB's failure to refuse and/or notify Universal which itself, an act or omission to act forming its own misrepresentation.

60. Universal justifiably relied upon NMB's misrepresentations.

61. Universal was damaged by NMB's misrepresentations.

WHEREFORE, the above premises considered, Universal demands judgment for compensatory damages against NMB in excess of $75,000.00 with interest, punitive damages, attorney fees and costs of this action, and such further and different relief as this Court deems just and proper.

### *Count IV – Tortious Inference with Prospective Advantage or Advantageous Business Relations*

62. Plaintiff restates Paragraphs 1 through 32 as if fully stated herein.

63. Diaz intentionally and willfully diverted Universal's borrowers to NMB, Universal's direct competitor, and completed such acts while his mortgage industry licensure was still associated with Universal, and/or transferred those relationships (and related confidential, proprietary, competitively sensitive, and business opportunity information) from Universal to NMB.

64. In exchange, NMB compensated Diaz, and upon information and belief incentivized Diaz, for his intentional and willful diversion of Universal's borrowers to NMB.

65. NMB's acts were calculated to cause damage to Universal in a loss of business, including a loss of employees and borrowers, including the Converted Loans.

66. NMB's acts were committed with unlawful or improper purpose to cause such damage, without justification.

67. Each time a prospective Universal borrower completed a mortgage loan with NMB represented a separate injury to Universal and the date of each such loss remains to be determined by Universal other than by review of applicable public recordation of lost borrower's mortgages with NMB.

68. As a direct and proximate result of NMB's intentional and unjustified interference, Universal suffered damages, including but not limited to, losing employees, borrowers and the income and/or benefits derived therefrom.

69. Both prior to, and immediately after, the Schiele and/or Diaz resignations from Universal, NMB intentionally and willfully encouraged Universal's former employees (including loan originators) to terminate their employment with Universal and/or to accept substantially

similar positions with NMB, Universal's direct competitor.

70. NMB's acts were calculated to cause damage to Universal in a loss of business, including the loss of employees and/or loan originators.

71. NMB's acts were illegal or unlawful pursuant to the Florida Uniform Trade Secrets Acts and/or the Florida S.A.F.E. Act, and/or were committed with unlawful or improper purpose to cause such damage, without justification.

72. As a direct and proximate result of NMB's intentional and unjustified interference, Universal suffered damages, including but not limited to, losing borrowers, employees and/or loan originators and the income and/or benefits derived therefrom and other such losses as yet to be realized.

WHEREFORE, the above premises considered, Universal demands judgment for compensatory damages against NMB in excess of $75,000.00 with interest, punitive damages, attorney fees and costs of this action, and such further and different relief as this Court deems just and proper.

### *Relief Demand*

WHEREFORE, Universal Mortgage & Finance, Inc. respectfully requests this Court grant the following relief:

A. Compensatory damages against Nationwide Mortgage Bankers, Inc. in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) to be determined;

B. Punitive Damages in an amount to be determined;

C. Award attorneys' fees and costs and expenses incurred in connection with the litigation in this matter; and

D. For such other and further relief as this Court may deem just and proper.

Dated this 21st day of December, 2021.

                                        Respectfully submitted,

                                        **EAVENSON, FRASER & LUNSFORD, PLLC**

                                        *s/ Thomas J. Fraser, Jr.*
                                        Thomas J. Fraser, Jr., Esquire
                                        Florida Bar No. 0155594
                                        Primary Email: tj@efli.law
                                        Secondary Email: sarah@efli.law
                                        4230 Pablo Professional Court, Suite 250
                                        Jacksonville, Florida 32224
                                        Telephone:  (904) 567-1160
                                        Facsimile:   (904) 567-1065

                                        *Attorney for Universal Mortgage & Finance, Inc.*